COURT OF APPEALS
DECISION
DATED AND FILED

July 15, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2026AP87**

Cir. Ct. No.  **2025ME138**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF K.L.W.:

FOND DU LAC COUNTY,

   PETITIONER-RESPONDENT,

 V.

K.L.W.,

   RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Fond du Lac County: LAURA J. LAVEY, Judge. *Affirmed*.

¶1      LAZAR, J.[1]  Karrie[2] appeals from orders for her initial commitment under WIS. STAT. § 51.20(1)(am), and for the involuntary administration of

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

medication and treatment under WIS. STAT. § 51.61(1)(g). She asserts that Fond du Lac County failed to prove, by clear and convincing evidence, that her conduct fell within one of the required statutory definitions of dangerousness. Karrie also asserts that the involuntary medication order must be reversed because the testifying psychiatrist did not adequately establish that she was incompetent to refuse medication. Finally, she contends that the fairness of the final hearing was undermined due to a witness sequestration issue.

¶2 The County argues that the uncontroverted testimony of its witnesses proves, by clear and convincing evidence, that Karrie was dangerous under the statute, and that it established that Karrie was not competent to refuse medication and treatment. Moreover, because the medication order has expired and the County has not sought to extend Karrie's commitment, that order is moot. Finally, the County asserts that Karrie forfeited the sequestration issue by not raising it below. Therefore, the County asserts this court should affirm the circuit court's findings and orders.

¶3 This court concludes that sufficient evidence was presented to establish Karrie's dangerousness, as well as her incompetence to refuse medication. Accordingly, both orders are affirmed.

---

[2] This court refers to the subject individual by a pseudonym consistent with WIS. STAT. § 809.19(1)(g), to protect her confidentiality.

## BACKGROUND

¶4     The County filed a statement of emergency detention for Karrie on August 13, 2025.[3]  At the hearing on August 15th, the circuit court commissioner found probable cause, and a final hearing was set for August 26th.

¶5     At the final hearing, the County called two witnesses, Wendy[4] and Dr. Khalid Chaudhry, Karrie's treating psychiatrist.  At the very start of the hearing, Karrie's attorney sought witness sequestration.[5]  The circuit court agreed and had witnesses leave the hearing room or, for those appearing virtually, stay in a separate Zoom room.  Sequestration was not mentioned again by any party.

¶6     Wendy testified that, on August 11, 2025, as she was driving away from the Harbor Haven building, Karrie threw Whipper Snappers at her car and that one landed on her lap.  Whipper Snappers are "[l]ittle fireworks [wrapped in paper] that kids throw on the ground that pop when they hit the cement."  The fireworks made a noise when they hit Wendy's car.  Wendy was concerned and afraid.  She was "[v]ery uncomfortable ... and very thankful it wasn't something worse."

---

[3] Pursuant to the Statement of Emergency Detention, Karrie was "acting in a bizarre [and] concerning manner."  She threatened an individual, and when approached by the police, she had to be physically restrained to avoid running out into the street.  She admitted to carrying an axe for years for protection, and her daughter alleged Karrie had been acting paranoid and burning various items in her backyard.

[4] As with the subject individual, this court uses a pseudonym to protect the witness's confidentiality.

[5] The proper term is "exclusion," not sequestration, of witnesses.  *See* WIS. STAT. § 906.15, Exclusion of witnesses.

¶7    When Wendy told Karrie she should not be throwing the fireworks, Karrie swore at her, telling her to "[f]uck off, bitch." Wendy called the police about the incident, because she was interested in getting Karrie help and she wanted to "get[ Karrie] off the street before she continued to do it to other people." Wendy did not want to press charges; she just wanted Karrie to get help.

¶8    The very next day, Wendy saw Karrie inside the Harbor Haven building. Karrie, who was standing inside moving a sign that was supposed to go on the grass, "got real close into" Wendy's face, and with a "[b]at shit crazy" look and a "dem[onic]" and "evil" voice, told Wendy, "[d]on't trip." Wendy, again, felt uncomfortable and concerned for her own safety. She also felt that Karrie "needed help[.]" Wendy did not call the police about the second incident because, when she spoke with one of her counselors at Harbor Haven, the counselor said she had "had a very unpleasant altercation" with Karrie and "that it was very clear to everybody around her that she was mentally unstable and [Wendy] should just let it go."

¶9    Chaudhry, the psychiatrist who had been treating Karrie, who had been kept in a separate Zoom room, was called as a witness after Wendy left the hearing. When Chaudhry discussed the statements in the Emergency Detention with Karrie, he said Karrie

> continued to be very dismissive, rationalize her psychotic behavior. She was very paranoid with totally impaired insight as well as judgment, so she was not able to totally understand comprehensively potential for risk to her. She continued to deny and being paranoid, defensive--

¶10    Chaudhry diagnosed Karrie as mentally ill, with "bipolar disorder type 1, most recent manic episode, with psychosis." Karrie "presented with severe psychotic behavior; over-productive, pressured, circumstantial speech; and severe

labile affect; and total impaired judgment and insight." Chaudhry found that Karrie's "diagnosis represent[ed] a substantial disorder of thought, mood, or perception" and "those substantial disorders grossly impair [Karrie's] judgment, behavior, capacity to recognize reality, or the ability to meet the ordinary demands of life[.]"

¶11     When providing reasons for his diagnosis, Chaudhry described several examples of Karrie's conduct, in addition to her pulling the fire alarm while on the unit:

> So she admit to us grossly impaired as evidenced by her behavior in the detention ward, confirmed as supported by her follow-up behavior and observation on the unit. Since she is under my treatment, she continues to be paranoid, defensive, accusing [Chaudhry] of--
>
> ....
>
> She has been accusing the people poisoning her, raping her, and other people annoying her. She kept asking for the rape kit, accusing that she has been being raped. And she did have that behavior at the hospital ER and continued to show that behavior on the unit.
>
> ….
>
> [And, on the unit, s]he was very aggressive verbally, hostile, confrontational, argumentative initially to the initial part, which is subsiding, but she continues to be very paranoid and aggressive verbally, argumentative, and confrontational. Still she has no insight.

¶12     Chaudhry's expert report was admitted as an exhibit at the conclusion of his testimony.[6]

---

[6] In Chaudhry's report, he noted that Karrie "has not been eating or drinking because she is scared people must have been poisoning her food or water she said." The circuit court relied on that information in its oral ruling.

¶13    The circuit court found that the County had met its burden to establish dangerousness as follows:

> In looking at the evidence presented today, I do think the County has met its burden. I'm going to say just barely, though, because the testimony from [Wendy] I do think shows a substantial probability of physical harm to others as manifested by the evidence that [Wendy] did fear for her safety and her -- and physical harm. I do believe that was evidenced by those recent acts from [Karrie] as indicated on both the 11th and the 12th. I do think that those two incidents taken into consideration as a whole is enough to show a pattern of recent acts where there would be a substantial probability of physical impairment or injury to, here, certainly others.
>
> I haven't heard any particular evidence presented today of harm to herself, although Dr. Chaudhry's initial intake report, that was Document 10, suggested some harm as it related to [Karrie] as well. In that report he talked about her not eating or drinking as a result of concerns that [Karrie] had that other people were poisoning her. I know there was testimony to that paranoid belief as well today. So not only is the [c]ourt looking at the information contained in the testimony today but also combined with the report that was received by the [c]ourt by way of Document 10.
>
> So I do think that under those standards the County has met its burden that [Karrie] is mentally ill. Dr. Chaudhry testified to bipolar type 1, presently having some manic episodes with psychosis; that she is a proper subject for treatment; that the standards for dangerousness under 2 and 3, and, again, that is looking at the substantial probability of physical harm to others, and then looking at impaired judgment manifested by a pattern of these recent acts that were discussed in court today, and substantial probability of either physical impairment or injury to herself or others.

¶14    The circuit court issued a six-month order of commitment, finding dangerousness under both WIS. STAT. § 51.20(1)(a)2.b. & c., and an order for involuntary administration of medication and treatment.

¶15    Karrie filed a timely notice of appeal on January 8, 2026.    On January 28th, the County filed a memorandum advising that it would not be seeking to extend Karrie's commitment, which was set to expire on February 26th. Karrie's commitment, and concomitant order for administration of involuntary medication and treatment, expired on February 26th.

**DISCUSSION**

¶16    Civil commitments require the petitioner (the County)[7] to establish by clear and convincing evidence that the subject individual is mentally ill, a proper subject for treatment, and dangerous to himself/herself or others under at least one of five statutory standards. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a)1.-2., (13)(e). "An individual's right to refuse unwanted medical treatment 'emanates from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, [S]ection 1 of the Wisconsin Constitution.'" *Outagamie County v. Melanie L.*, 2013 WI 67, ¶42, 349 Wis. 2d 148, 833 N.W.2d 607 (alteration in original; quoting *Lenz v. L.E. Phillips Career Dev. Ctr.*, 167 Wis. 2d 53, 67, 482 N.W.2d 60 (1992)).

¶17    The review of a civil commitment order—determining whether the petitioner has met its burden of proof—presents a mixed question of law and fact. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A circuit court's findings of fact are upheld unless they are clearly erroneous, *id.*,

---

[7] Under WIS. STAT. ch. 51, county governments are given "primary responsibility for the well-being, treatment and care of the mentally ill[.]" WIS. STAT. § 51.42(1)(b).

and appellate courts will "accept reasonable inferences from the facts[.]" *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Appellate courts are to defer to the circuit court's credibility determinations, *State v. Young*, 2009 WI App 22, ¶17, 316 Wis. 2d 114, 762 N.W.2d 736, and may also search the circuit court's record for evidence to support the findings of fact, *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

¶18 Each of the issues is addressed below.

## I. The circuit court found dangerousness by sufficient evidence.

¶19 The circuit court found Karrie to be dangerous under two provisions of WIS. STAT. § 51.20(1)(a)2.:

> 2. The individual is dangerous because he or she does any of the following:
>
> ....
>
> b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, **or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm**. ...
>
> c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial under this [WIS. STAT. § 51.20(1)(a)]2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if

8

the individual may be provided protective placement or protective services under [WIS. STAT.] ch. 55 ... . Food, shelter or other care provided to an individual who is substantially incapable of obtaining the care for himself or herself, by a person other than a treatment facility, does not constitute reasonable provision for the subject individual's protection available in the community under this [§ 51.20(1)(a)]2.c.

§ 51.20(1)(a)2.b.-c. (emphasis added).

¶20    In this appeal, while there may be some question as to whether the circuit court made sufficient factual findings as to WIS. STAT. § 51.20(1)(a)2.c.,[8] this court concludes that is not the case with respect to § 51.20(1)(a)2.b.

¶21    Our supreme court, in *D.K.*, explained that, pursuant to the "plain language" of the statute, the finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.b. "requires a showing that it is much more likely than not that the individual will cause physical harm to other individuals." *D.K.*, 390 Wis. 2d 50, ¶42. When considering whether that standard has been met, the decision of the circuit court "can be supported by evidence that at least one person was placed in 'reasonable fear of violent behavior and serious physical harm' to that same person or another." *Id.* (citing § 51.20(1)(a)2.b.).

¶22    In this case, Wendy testified about Karrie throwing fireworks at her car and in her lap. While it is correct that Whipper Snapper fireworks just make small snapping, popping sounds when they hit a hard enough surface, they are not

---

[8] It is not necessary to resolve this issue, as there were sufficient factual findings to support another standard. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (explaining that the appellate courts should decide appeals on the narrowest possible grounds); *Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (explaining that when one issue is dispositive of an appeal, we need not discuss other issues).

something that should be thrown at and into moving cars. It is entirely reasonable that a driver would be shocked, distracted, concerned, and even frightened when something like that is thrown at them. A driver could have swerved into traffic or been distracted, and not seen a pedestrian walking across the road. Either of those circumstances would cause physical harm to Wendy or others nearby. Add to that, Wendy's concerns and fears were increased when she met Karrie again the next day where Karrie was acting in a strange, demonic fashion. While the statement itself was not intrinsically threatening, the manner and tone—when added to the Whipper Snapper and swearing incident—were sufficient to cause Wendy to reasonably fear for her safety.

¶23     It is well established that the County need not prove actual harm or that the threats had been carried out. *See D.K.*, 390 Wis. 2d 50, ¶42. This court concludes that the circuit court's findings of fact were not clearly erroneous, *see D.J.W.*, 391 Wis. 2d 231, ¶24, that it found Wendy's testimony as to her fear for her and other people's safety credible, *see Young*, 316 Wis. 2d 114, ¶17, and that Karrie's actions were such to cause Wendy to be reasonably in fear of violent behavior and serious harm, *see Christopher S.*, 366 Wis. 2d 1, ¶50. Accordingly, there was sufficient evidence[9] to support the court's conclusion that Karrie was dangerous under WIS. STAT. § 51.20(1)(a)2.b.

---

[9] The County also pointed to Karrie's threat to kill the stranger pumping gas as another example of her threats of harm or violent behavior. That incident was contained in Chaudhry's expert report and never testified to at the final hearing. While the report was admitted into evidence, and its contents, if not inadmissible hearsay, may be considered in support of the circuit court's decision, it is not necessary for this court to add them to evidence already discussed in this opinion. Accordingly, that incident will not be discussed further.

## II. The medication order was supported by sufficient evidence.

¶24 Karrie argues that the order for the administration of involuntary medication and treatment (hereinafter referred to as the medication order) cannot stand because the proof of incompetence to refuse medication was "conclusory and legally insufficient" pursuant to *Melanie L.*, 349 Wis. 2d 148, and *Virgil D. v. Rock County*, 189 Wis. 2d 1, 524 N.W.2d 894 (1994). She takes issue with Chaudhry's testimony as deficient, based solely on his conclusions, and no more "than a formulaic recital." The County asserts that it met its burden, by clear and convincing evidence, to establish that Karrie was incompetent, as she was incapable of expressing an understanding of the advantages, disadvantages, and alternatives to determine whether to accept or refuse medication or treatment. *See Outagamie County v. L.X.D.-O.*, 2023 WI App 17, ¶22, 407 Wis. 2d 441, 991 N.W.2d 518 (explaining how an individual can be found incompetent to refuse medication). This court agrees.

¶25 The circuit court, summarizing the detailed testimony of Chaudhry, concluded that the County had, indeed, met its burden with respect to the medication order, to wit:

> As it relates to the involuntary medication order, Dr. Chaudhry did indicate that he had discussions with her, and it sounds like he hasn't had that opportunity today, but that he's had multiple conversations with her about the advantages and disadvantages of medication and treatment for her mental illness, that that medication and treatment will have a therapeutic value, and he was very clear in his determination that he believed that [Karrie], as a result of her mental illness, was incapable of expressing an understanding of those advantages and disadvantages and alternatives to accepting that recommended medication or treatment. He also indicated that she was substantially incapable of applying an understanding of those advantages and disadvantages and alternatives to her condition, such that she otherwise be able to make an informed choice as to

whether to accept or refuse that recommendation for medication or treatment. So I am finding that the standards for an involuntary medication order have been met by the County as well, and I will grant that.

¶26 As opposed to its statement that the County had "barely" established dangerousness, there was no such equivocation in its medication order determination. A further review of the Record indicates that Chaudhry advised the circuit court that when he spoke with Karrie on four separate occasions about medication, "[s]he continued to be dismissive, paranoid, and facetious, accusatory for giving her medication she doesn't need." This was further supported in Chaudhry's expert report.

¶27 As a final argument, the County asserts that, because the medication order expired in February 2026, and there are no collateral consequences that derive from such an order, Karrie's appeal as to that order is moot. Moreover, Karrie did not argue any exceptions to mootness in her initial brief. Karrie asserts that, if the commitment order is reversed, the medication order cannot stand. She also asserts that exceptions to the medication order's mootness apply.

¶28 First, while our state supreme court has determined that mental commitment appeals are not moot based upon at least two collateral consequences, *see* **Sauk County v. S.A.M.**, 2022 WI 46, ¶3, 402 Wis. 2d 379, 975 N.W.2d 162, those consequences have never been applied to a medication order. Moreover, the County has decided not to seek an extension of Karrie's commitment, and the medication order is necessarily no longer in effect. If there was ever an appeal in which an order was moot, this is clearly it. Even assuming mootness, this court concludes that the County met its burden and the circuit court did not err by issuing the medication order.

### III. The witness exclusion issue is not applicable.

¶29     This court agrees that WIS. STAT. § 906.15(1) imposes mandatory exclusion of witnesses except in certain circumstances.[10]  It provides that "[a]t the request of a party, the judge ... *shall* order witnesses excluded so that they cannot hear the testimony of other witnesses."  *Id.* (emphasis added).

¶30     Karrie's counsel did not object or even raise this issue below to allow the circuit court to correct any perceived harm.  "Except in rare circumstances that are not present here, we will not address an issue that an appellant raises for the first time on appeal, because doing so undermines judicial economy and creates an incentive for parties to build in error in order to have an adverse outcome in the [circuit] court overturned on appeal."  *Greene v. Hahn*, 2004 WI App 214, ¶21, 277 Wis. 2d 473, 689 N.W.2d 657; *see also State v. Hayes*, 2004 WI 80, ¶21, 273 Wis. 2d 1, 681 N.W.2d 203 (explaining that the court may decline to address arguments raised for the first time on appeal).

¶31     If that were not sufficient to dispose of this issue, in her appellate brief, Karrie contends that, because Chaudhry logged in to Zoom after the circuit court granted her exclusion request, and while there is no proof of a violation of that order "it does explain why defense counsel later raised concern about whether [Chaudhry] had been listening."  To start, Chaudhry logged in almost immediately after the court granted the order and right after it had instructed its clerk to make certain that "[e]verybody else is currently in a separate room[.]"

---

[10] Parties, corporate representatives, essential persons, and victims may not be excluded. WIS. STAT. § 906.15(2).

¶32    Finally, Karrie's assertion about defense counsel's "concern" is not identified by a cite to the Record.    This is a violation of WIS. STAT. RULE § 809.19(1)(d) & (3), which require parties to set out facts "relevant to the issues presented for review, with appropriate references to the record." Sec. 809.19(1)(d).  "An appellate court is improperly burdened where briefs fail to consistently and accurately cite to the record."  *Useni v. Boudron*, 2003 WI App 98, ¶1 n.2, 264 Wis. 2d 783, 662 N.W.2d 672; *see also Meyer v. Fronimades*, 2 Wis. 2d 89, 93-94, 86 N.W.2d 25 (1957) ("[I]t places a completely unwarranted burden on this court to decide an appeal presented on a brief" that does not have citations to the record.).

¶33    Aside from violating appellate procedure, this argument is pure speculation.  *See, e.g.*, *Hernke v. Northern Ins. Co.*, 20 Wis. 2d 352, 360, 122 N.W.2d 395 (1963) ("The burden of proof as to injuries is upon the plaintiff, and his medical testimony in meeting such burden cannot be based on mere possibilities."); *Helland v. Kurtis A. Froedtert Mem. Lutheran Hosp.*, 229 Wis. 2d 751, 756, 601 N.W.2d 318 (Ct. App. 1999) (explaining that to establish a factual dispute for summary judgment, "[i]t is not enough to rely upon unsubstantiated conclusory remarks, speculation, or testimony which is not based upon personal knowledge"); *State v. Franklin*, 111 Wis. 2d 681, 686, 331 N.W.2d 633 (Ct. App. 1983) (explaining that to meet the burden of proof, "it is not sufficient that [the defendant] show a mere possibility or suspicion that a conflict could arise under hypothetical circumstances").  Karrie even concedes in her brief, as she must, that this issue is absolutely hypothetical: "[t]he point is not that the present record conclusively establishes misconduct.  It does not.  The point is that, in a case decided on a narrow and fragile record, unresolved uncertainty about compliance with the sequestration order matters more, not less."

¶34    Accordingly, this court declines to further address this last argument.

## CONCLUSION

¶35    Based upon the foregoing, this court concludes that Fond du Lac County presented sufficient evidence to establish Karrie was dangerous under a statutory standard and that Karrie was not competent to accept or refuse medication. The circuit court did not err in issuing the orders. Accordingly, this court affirms the circuit court's order committing Karrie and the corresponding order for the involuntary administration of medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.